UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AGILITY PUBLIC WAREHOUSING COMPANY K.S.C., et al.,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**DEPARTMENT OF DEFENSE, et al.,**<br><br>**Defendants.** | Civil Action No. 14-1064 (JDB) |

## MEMORANDUM OPINION

Whistleblowers sent two emails to the Defense Logistics Agency claiming that Kuwait & Gulf Link Transport Company ("KGL"), a government contractor, had illicit ties to Iran that ought to disqualify the company from winning certain contracts. Although the whistleblowers called themselves "Scott Wilson," the emails were later traced back to Agility Public Warehousing—the plaintiff in this case and a competing government contractor. Aggrieved by these emails, KGL sued Agility in Pennsylvania state court, claiming defamation and tortious interference with contractual and other business relationships. Alas, the sultry details (whistleblowers! Iran! feuding contractors! defamation!) are being explored in state court.

Some more mundane aspects of this dispute have found their way here to the District Court for the District of Columbia. To defend itself in Pennsylvania, Agility sought information from DLA, demanding access to various documents and employee testimony through third-party subpoenas. DLA responded to these subpoenas, granting some requests for information, but denying others. All told, DLA eventually provided Agility with more than 1,000 documents, and

1

it has made two of its employees available for depositions.[1]  Some of those documents have been produced by DLA in response to valid points raised by Agility.  But disagreements remain:  Agility claims that DLA has improperly withheld (in whole or in part) just over 100 additional documents, and it claims that this withholding rises to the level of arbitrary and capricious behavior under the Administrative Procedure Act.  It has therefore filed a motion to compel production of these documents—which really amounts to a motion for partial summary judgment on its APA claim.[2]  For the reasons explained below, and after in camera review of the disputed documents, the Court will grant Agility's motion in part and deny it in part.

## DISCUSSION

Any analysis in this case must begin with a nod to United States ex rel. Touhy v. Ragen, 340 U.S. 462 (1951).  In that case, the Supreme Court explained that an agency employee could not be held in contempt for refusing to submit to a subpoena "on the ground that [he] is prohibited from making such submission by his superior."  Id. at 467.  In the wake of that case, the Department of Defense—like other federal government entities—promulgated regulations (called, appropriately, Touhy regulations) that govern responses to third-party subpoenas for documents or testimony.  See, e.g., 32 C.F.R. § 97.6.  The regulations make clear the Department's "policy that official information should generally be made reasonably available for use in Federal and State

---

[1] As far as the Court can tell, neither deposition has actually occurred just yet.  One deposition, that of Normand Lussier, an associate general counsel at DLA, is scheduled to occur in the next few days.  The scheduling of that deposition—which this Court had no hand in—has produced something of a time crunch regarding this case.  After expeditiously briefing the present motion to compel, the parties have asked this Court to (even more expeditiously) decide what amounts to a substantial portion of the merits of this APA case.  Needless to say, the Court is not a big fan of this arrangement.  The parties, after all, asked that the Court stay all summary-judgment proceedings back in December 2014, and they only reconsidered that decision (and reignited their summary-judgment litigation) a month ago, on May 12, 2015.  Thus, the rush in this case is a manufactured one, owing to the parties' strategic choices—which, in retrospect, have turned out to be poor ones, perhaps for both sides—and other litigation delays.  The underlying subpoenas giving rise to this action were filed over fifteen months ago, in March 2014.

[2] See Pls.' Mot. to Compel or for Partial Summ. J. [ECF No. 40] ("Pls.' Mot."); Gov't's Opp'n to Pls.' Mot. [ECF No. 41] ("Gov't's Mot."); Pls.' Reply to Gov't's Opp'n [ECF No. 43] ("Pls.' Reply").

courts and by other governmental bodies <u>unless</u> the information is classified, <u>privileged</u>, or otherwise protected from public disclosure." <u>Id.</u> § 97.4 (emphasis added).  Invoking these regulations, DLA claims that several "privileges" justify the withholdings at issue here, including the deliberative-process privilege, the attorney-client privilege, the work-product doctrine, and the criminal provisions of the Trade Secrets Act.

In cases like this, where "the agency refuses to produce the requested documents, the sole remedy for the state-court litigant is to file a collateral action in federal court under the APA." <u>Houston Bus. Journal, Inc. v. Office of Comptroller of Currency</u>, 86 F.3d 1208, 1212 (D.C. Cir. 1996).  As an APA case, then, the question is whether "the government has refused production in an arbitrary, capricious, or otherwise unlawful manner."  <u>COMSAT Corp. v. Nat'l Sci. Found.</u>, 190 F.3d 269, 277 (4th Cir. 1999); <u>see also</u> <u>Watts v. SEC</u>, 482 F.3d 501, 508 n.* (D.C. Cir. 2007) (noting the arbitrary and capricious standard applies in this kind of case).  And that determination turns on whether the agency properly applied its claimed privileges.  <u>See</u> <u>Puerto Rico v. United States</u>, 490 F.3d 50, 70–71 (1st Cir. 2007) ("These materials fall within the scope of the . . . privilege . . . . [Therefore,] the FBI was neither arbitrary nor capricious in withholding such information.").  As the Court reviews the Agency's privilege claims, the usual APA burden of proof controls:  the Court will "presume[] agency action to be valid," and it is Agility's task to overcome this presumption.  <u>Ethyl Corp. v. EPA</u>, 541 F.2d 1, 34 (D.C. Cir. 1976); <u>see also</u> <u>Puerto Rico</u>, 490 F.3d at 61 (applying deference to agency withholdings).

Before diving into the merits, a brief roadmap might prove useful.  The parties are currently at odds concerning (by the Court's count) 144 documents.  For 136 of these documents, DLA has elected to withhold the document under the deliberative-process privilege, the attorney-client privilege, the work-product doctrine, or some combination of the three.  This leaves eight

3

documents, which DLA continues to withhold based on its non-disclosure responsibilities under the Trade Secrets Act. The Court will discuss each of these justifications, in turn.

**I.    DELIBERATIVE-PROCESS PRIVILEGE**

Start with the deliberative-process privilege, which is an "ancient privilege . . . predicated on the recognition that the quality of administrative decision-making would be seriously undermined if agencies were forced to operate in a fishbowl." Dow Jones & Co. v. Dep't of Justice, 917 F.2d 571, 573 (D.C. Cir. 1990) (internal quotation marks omitted). The privilege covers materials "that are both predecisional and deliberative," Judicial Watch, Inc. v. Food & Drug Admin., 449 F.3d 141, 151 (D.C. Cir. 2006); that is to say, documents that are "generated before the adoption of an agency policy" and that "reflect[] the give-and-take of the consultative process," Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980).

The Court is satisfied that the still-withheld documents fit this two-part description. First, the documents (and their redacted portions) reflect "pre-decisional" information. To establish a document's pre-decisional character, DLA need only "identify[] the decisionmaking process to which [the documents in question] contributed." Access Reports v. Dep't of Justice, 926 F.2d 1192, 1196 (D.C. Cir. 1991). And it has done so here. Indeed, the declaration of Daniel Poling (another associate general counsel at DLA) highlights "six categories of agency decisions" to which the challenged documents contributed: "responses to congressional inquiries"; "response[s] to inquiries by members of the media"; "response[s] to KGL's requests for documents under the [Freedom of Information Act]"; "response[s] to inquiries made by the Baragona family"; "responsibility determinations for KGL"; and "other miscellaneous agency actions or decisions." Poling Decl. [ECF No. 41-3] ("Decl.") at 11. Courts routinely protect information leading to decisions of this type. See, e.g., Krikorian v. Dep't of State, 984 F.2d 461, 466 (D.C. Cir. 1993)

(protecting "draft letters" responding to public inquiries); Whitaker v. CIA, 31 F. Supp. 3d 23, 39–40 (D.D.C. 2014) (protecting "intermediate recommendations" regarding an agency's response to a FOIA request); Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec., 736 F. Supp. 2d 202, 208 (D.D.C. 2010) (protecting "email messages involving recommendations and evaluations for how to respond to Congressional and media requests for information").

Second, the redactions are also "deliberative" in nature, as they "reflect[] the give-and-take" of internal agency decision-making. Coastal States, 617 F.2d at 866. As Poling describes (and as the Court's in camera review confirms), the documents in question contain all manner of deliberative material. See Decl. at 11, 12. For example, many disputed documents are draft letters to members of Congress or to the Baragona family—and "[d]raft documents, by their very nature, are typically predecisional and deliberative." Exxon Corp. v. Dep't of Energy, 585 F. Supp. 690, 698 (D.D.C. 1983). Beyond these drafts, the disputed-document pile contains numerous email chains, which (if left unredacted) would reveal discussions between DLA staff regarding how best to respond to requests from the public. Consider, for example, documents 11888, 11892, and 11897, which are emails traded by attorneys discussing a request for information from KGL. Revealing this exchange would bring to light the preliminary thoughts of agency staff about how best to interpret this request. In other words, it would reveal exactly the kind of information that the deliberative-process privilege is meant to protect. See, e.g., Whitaker, 31 F. Supp. 3d at 39. Agility simply has not overcome the presumption that DLA properly withheld this material.

But that conclusion does not quite end things. As Agility points out, the deliberative-process privilege is "a qualified [one] and can be overcome by a sufficient showing of need." In re Sealed Case, 121 F.3d 729, 737 (D.C. Cir. 1997). "This need determination is to be made flexibly on a case-by-case, ad hoc basis," and district courts should "tak[e] into account factors

such as the relevance of the evidence, the availability of other evidence, the seriousness of the litigation, the role of the government, and the possibility of future timidity by government employees." Id. at 737–38 (internal quotation marks omitted).  Weighing these factors, the Court concludes that Agility has not made the necessary showing.

For one thing, several factors favor application of the privilege in this case.  As DLA asserts (and as Agility cannot seriously rebut), "[r]evealing these pre-decisional records would have a harmful impact on agency decision-making, as government personnel would be reticent to make honest comments, prepare and share draft documents, and formulate briefings on alternative courses of action." Decl. at 14.  The Court's in camera review of the withheld documents confirms that this fear is no bogeyman—draft letters to members of Congress or to grieving family members, for example, are hardly the kind of thing most employees would like to see made public. Moreover, "the [agency] has already given [Agility] access to a tremendous amount of information" in the form of over 1,000 documents.  Hinckley v. United States, 140 F.3d 277, 286 (D.C. Cir. 1998).  Indeed, additional information is on the way, as Agility will soon have the chance to depose two DLA employees.  Finally, DLA has no formal role in the Pennsylvania litigation—it is not a party to that case, and (as Agility acknowledges) it "d[oes] not have a 'stake in the outcome' of the Pennsylvania litigation because 'KGL and DLA are not co-defendants, they are not working to devise and implement a cohesive legal strategy, and the outcome of th[at] action has no bearing upon any right or remedy of DLA.'" Pls.' Reply at 9 n.4 (quoting Ex. I to Pls.' Mot. for Summ. J. [ECF No. 28-10] at 5).

The remaining factors do little to shift the balance.  Consider first the relevance of the agency's withheld information.  As described, the Pennsylvania case involves defamation and tortious-interference claims, which largely stem from emails sent by "Scott Wilson" alleging that

6

KGL had illicit ties to Iran. But as confirmed by the Court's in camera review, very few of the disputed documents have anything to do with those "whistleblower" emails. In fact, the vast majority of documents reflect discussions about congressional, media, and public inquiries that have nothing to do with "Scott Wilson." Any "relevance" of this information to Agility's Pennsylvania defense is therefore slim. Of course, this means that Agility's hopes rest almost entirely on the "seriousness" of the Pennsylvania litigation. And no doubt that case is an important one—especially for the parties involved. But this single factor cannot outweigh the others stacked against it. See Hinckley, 140 F.3d at 286 ("[T]he balance weighs strongly against granting . . . access to the [agency's] internal deliberations, notwithstanding the seriousness of the present litigation."). Thus, the privilege survives.

Agility disagrees with just about all of this. It first claims that its review of unredacted versions of many documents shows that DLA has improperly redacted "factual, investigative matter" that does not qualify as "deliberative"; it therefore asks the Court to reject the deliberative-process claims in their entirety. Pls.' Mot. at 26–27, 29 (internal quotation marks omitted). But courts must not assess the reach of the deliberative-process privilege according to some black/white, fact/opinion divide. Even "factual" material can be protected, so long as it "reflect[s] an agency's preliminary positions or ruminations about how to exercise discretion on some policy matter." Petroleum Information Corp. v. U.S. Dep't of Interior, 976 F.2d 1429, 1435 (D.C. Cir. 1992). And this more nuanced rule applies to the documents Agility cites, including document 6612. Yes, that email chain contains redacted "factual" statements regarding whether or not DLA personnel received several documents. But those statements were made in the context of agency deliberation regarding how best to respond to a request for information from KGL's counsel. See Ex. M to Pls.' Mot. [ECF No. 40-17] at 1–2. Put differently, the statements are not the agency's

final word; they are, instead, preliminary factual recitations in a broader discussion about the appropriate response to KGL's request. Agility therefore has not convinced this Court that documents like these fall outside the privilege's protections.[3]

Agility persists that the deliberative-process privilege should not apply in this case at all, because it lodged "credible allegations of misconduct by DLA." Pls.' Mot. at 31.[4] But the government-misconduct exception to the deliberative-process privilege is a narrow one—otherwise, "if every hint of marginal misconduct sufficed to erase the privilege, the exception would swallow the rule." Hall & Assocs. v. EPA, 14 F. Supp. 3d 1, 9 (D.D.C. 2014) (internal quotation marks and brackets omitted). Thus, "to preclude application of the . . . privilege . . . , the claimed governmental misconduct must be severe enough to qualify as nefarious or extreme government wrongdoing." Neighborhood Assistance Corp. of Am. v. U.S. Dep't of Hous. & Urban Dev., 19 F. Supp. 3d 1, 14 (D.D.C. 2013). This case does not meet that high bar, for two reasons.

First, Agility has failed to point to any behavior that warrants the "nefarious" or "extreme" moniker. The bulk of Agility's misconduct claims revolve around various "leaks" of DLA information to third parties. See Pls.' Reply at 12–13. Other claims relate to a decision to share information with KGL without requiring it to file a formal Touhy request. But where Agility sees "extreme" government misconduct, the Court sees only (at worst) errors in judgment. After all,

---

[3] This is not to say that all of these documents may continue to be withheld. As discussed infra at 10, where DLA has previously released an unredacted version of a withheld document, and where it has not sought to claw-back those released documents, DLA is deemed to have waived any privilege protecting the document. Document 6612 falls into this category; hence, DLA cannot withhold it.

[4] Agility offers one other, related argument: because DLA has (in its view) acted in bad faith, the Court ought to find that the agency has broadly waived the protections of the deliberative-process privilege. See Pls.' Mot. at 32 n.10. But there is no authority for applying the broad, subject-matter waiver rule to this privilege; indeed, the cases suggest that the rule does not apply in this context. See In re Sealed Case, 121 F.3d at 741 ("[C]ourts have said that release of a document only waives [the deliberative-process privilege] for the document or information specifically released, and not for related materials."). This half-hearted argument—presented in a footnote—gets Agility nowhere.

8

the supposed "leaks" appear to concern non-privileged (and certainly unclassified) information, and a failure to follow agency rules is not the sort of activity that typically overpowers the privilege. See, e.g., ICM Registry, LLC v. U.S. Dep't of Commerce, 538 F. Supp. 2d 130, 133 (D.D.C. 2008) ("In the rare cases that have actually applied the exception, the 'policy discussions' sought to be protected . . . were so out of bounds that merely discussing them was evidence of a serious breach of the responsibilities of representative government.").

Second, the government-misconduct exception only comes into play where there is "at least some connection between the government misconduct and the documents." Convertino v. U.S. Dep't of Justice, 674 F. Supp. 2d 97, 104 (D.D.C. 2009). But no such connection exists here—as Poling's declaration and the Court's in camera review make clear. Poling avers: "I have conducted a document-by-document review of the challenged documents. None of the documents challenged by [Agility] touch upon [the] alleged misconduct." Decl. at 14. The Court has done the same thing and reaches the same conclusion: none of the documents say anything about the "leaking" of information to third parties; and none suggest doing an end-run around agency rules or other requirements. The government-misconduct exception therefore has no application here, and—again—the deliberative-process privilege survives. See ICM Registry, 538 F. Supp. 2d at 133 (noting that the deliberative process privilege "disappear[s]" only where "[t]he very discussion [sought to be protected] . . . was an act of government misconduct").

Taking a slightly different tack, Agility next contends that Poling's declaration describing the withheld documents is not to be believed, because it "[m]ay [b]e [t]ainted [w]ith [b]ias." Pls.' Reply at 20. From whence this bias comes is not exactly clear; Agility only vaguely claims that Poling might be "implicated by the documents." Id. But just because Poling sent and received emails that are now the subject of DLA's privilege claims does not disqualify him from asserting

9

those claims on the agency's behalf. Indeed, the cases say that "responsible members or officers" of an agency are perfectly qualified to invoke and defend the deliberative-process privilege. Landry v. FDIC, 204 F.3d 1125, 1135 (D.C. Cir. 2000) (internal quotation marks and emphasis omitted). And Poling meets that description. See Decl. at 8 ("The DLA General Counsel has authorized me to assert these privileges on behalf of DLA in this declaration."). In any event, the Court has not exclusively relied on Poling's declaration. Instead, it has read that declaration in light of both the agency's privilege log and its own in camera review of the disputed documents. On the basis of all of these sources, the Court concludes that DLA properly applied the deliberative-process privilege in this case.

With these general conclusions out of the way, a little housekeeping is in order. To start, none of the foregoing applies to those documents which DLA continues to withhold under the deliberative-process privilege, but which it has already (perhaps accidentally) produced to Agility. The privilege that would normally protect these documents has been waived, see In re Sealed Case, 121 F.3d at 741, and DLA must immediately produce unredacted copies of the following documents: 530, 537, 542, 742 (but only the second page (i.e., pg. 743)), 6612, 7095, 7471, 9567, 9574, 9801, 9808 (but only the second page (i.e., pg. 9809)), 11351, 11356, and 13112.[5] However, this waiver does not affect document numbers 1452 and 2677, as DLA "intends to claw back" these documents. Pls.' Reply at 10 n.6. The Court has reviewed these two documents in camera and concludes that the redactions are properly subject to the deliberative-process privilege.

## II. ATTORNEY-CLIENT PRIVILEGE

Next, the Court considers not just an ancient privilege, but the oldest of them all—the attorney-client privilege. See Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). "[T]he

---

[5] Any other documents that fall into this category should similarly be produced.

privilege applies to a confidential communication between attorney and client if that communication was made for the purpose of obtaining or providing legal advice to the client." In re Kellogg Brown & Root, Inc., 756 F.3d 754, 757 (D.C. Cir. 2014). And "[t]he privilege is not limited to communications made in the context of . . . a specific dispute, but extends to all situations in which an attorney's counsel is sought on a legal matter." Coastal States, 617 F.2d at 862.

DLA's privilege log and declaration (and the Court's in camera review) reveal that the still-disputed documents fit comfortably within the attorney-client confines. The privilege log, for example, includes entries for every document withheld under this privilege, and the entries show that (1) the documents are communications (usually, emails) between Defense Department employees and DLA counsel, and (2) the documents contain legal opinions or advice. See, e.g., Privilege Log [ECF No. 41-2] at 2 (describing document 614, which is an email between an associate general counsel at DLA and other Department employees regarding "legal analysis and opinion of a DLA attorney in response to a question from [a] client about media allegations of KGL wrongdoing").[6] Poling's declaration confirms that DLA properly applied the attorney-client privilege to the disputed documents. See Decl. at 15; see also SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (noting that agency declarations come with a "presumption of good faith"). Finally, the Court's in camera review of the documents puts this dispute to rest. The redactions in each of the documents still in dispute reflect privileged communications—some are client requests to counsel, some are counsel responses, but all are properly protected by the attorney-client privilege.

This is not the final word on this issue, however. "[T]he confidentiality of communications covered by the [attorney-client] privilege must be jealously guarded by the holder of the privilege

---

[6] Just so that the record is clear: Agility has declined to challenge the sufficiency of DLA's privilege log; and its briefs do not explicitly challenge any specific documents withheld under the attorney-client privilege.

lest it be waived." In re Sealed Case, 877 F.2d 976, 980 (D.C. Cir. 1989). And the privilege can be waived even by "inadvertent" disclosures. Id. (internal quotation marks omitted). As all parties now agree, some disclosures—perhaps accidental, perhaps not—have occurred here. See Gov't's Opp'n at 40 (acknowledging that the documents numbered 555, 735, and 6572 had previously been released in unredacted form). The attorney-client privilege that would normally attach to these documents has therefore been waived.

But this prompts a follow-up question: given these documents' release, what is the proper scope of the waiver? At the outset, it is clear that the waiver is not necessarily confined to the three documents that (everyone agrees) have now been disclosed, because "a waiver of the privilege in an attorney-client communication extends to all other communications relating to the same subject matter." In re Sealed Case, 877 F.2d. at 980–81 (internal quotation marks omitted).[7] But the boundaries of this subject-matter waiver depend on the facts of any given case, and the Court (in its discretion, see id. at 981) concludes that the subjects covered by these released documents are quite narrow. The documents, after all, contain only very brief email communications between Defense Department employees and DLA attorneys, and the (otherwise privileged) subject matter discussed in those emails is likewise circumspect. For example, the privileged material in document 555 is only two sentences long and includes a summary from Uldric Fiore (a Department employee) of his testimony before a congressional committee. See Ex. S to Pls.' Mot. [ECF No. 40-23] at 2. Thus, the privilege has only been waived regarding other withheld material that discusses Fiore's testimony.

---

[7] DLA suggests that subject-matter waiver only applies where disclosure and withholding decisions have been made in bad faith (e.g., where the privilege is used to gain a tactical advantage). See Gov't's Opp'n at 40. But this is incorrect. Although using the privilege to gain advantage is certainly one way to broadly waive the attorney-client privilege, such tinkering with the privilege is not a prerequisite for subject-matter waiver. The cases make this clear. See, e.g., In re Sealed Case, 877 F.2d at 980 (finding that "inadvertent" disclosures can trigger subject-matter waiver).

That conclusion (more or less) takes care of document 735. Although this second document contains significantly more redacted material, it covers the same subject matter as the first. Like document 555, it is an email chain between various Defense Department employees, and the initiating email seeks advice on how to respond to a congressional inquiry. Fiore again responds by summarizing his previous testimony to Congress, including his explanations for why certain proposed contracting changes would be a bad idea, as well as his description of an accident that killed an individual named Rocky Baragona. See Ex. U to Pls.' Mot. [ECF No. 40-25] at 2, 3. The email chain also includes a brief message from Steven Shaw, another Defense Department employee, who notes that he "defer[s] to [Fiore]" on congressional-inquiry questions like these, and then offers a brief, one-sentence opinion regarding the proposed contracting changes. Id. at 3. The subject matter of document 735 therefore substantially overlaps with that of document 555, and the Court concludes that the Agency's waiver only extends to other material that reflects Fiore's testimony or Shaw's opinion regarding the proposed contracting modification.[8]

Finally, all parties agree that document 6572 has now been disclosed. This document is an email from Poling (who, as the reader may recall, works in the general counsel's office at DLA), telling various Defense Department employees that the Government Accountability Office has released an opinion dismissing various challenges to an agency decision awarding a contract to KGL. See Ex. W. to Pls.' Mot. [ECF No. 40-27] at 2–3. But that is it. There is no analysis of the GAO opinion, no commentary on the outcome (aside from Poling's "Good news!" opening sentence, which was never redacted and therefore never the subject of a privilege claim, see id. at

---

[8] Agility has not identified any documents that include communications that fall within this narrow subject-matter range, but—based on the Court's in camera review—it seems that several documents contain the same redacted material as that found in documents 555 and 735 (i.e., the same emails from Fiore and Shaw). Thus, the Fiore and Shaw emails in documents 742, 9801, and 9808 ought to be disclosed to Agility. The Court notes that if any additional material exists that meets the Court's subject-matter description, DLA is, of course, obliged to produce it.

13

2), and no request for advice or legal opinion from the email's recipients. It is, instead, merely a summary of the key points from a separate agency's adjudication. It is therefore doubtful whether this email fits the attorney-client-privilege mold at all. If it is not privileged, Agility of course cannot use its revelation to "justify the forced disclosure of additional privileged information," because "[t]he disclosure of non-privileged information can never do that." Trustees of Elec. Workers Local No. 26 Pension Trust Fund v. Trust Fund Advisors, Inc., 266 F.R.D. 1, 10 (D.D.C. 2010).[9] But even assuming that it is privileged, the document's subject matter is—once again— quite narrow; waiver would extend only to other material dealing with the GAO opinion.[10]

All of this is something of a pyrrhic victory for Agility, which would prefer a much broader definition of the disclosed documents' subject matter. Indeed, it thinks the waiver should extend to all documents "relating to the . . . award [of a particular government contract], congressional inquiries regarding KGL, [communications with] the Baragona[] [family], KGL's ties to sanctioned Iranian entities, and . . . law enforcement activities relating to any investigations of such ties." Pls.' Reply at 24. But this asks far too much. "Generally, the privilege is waived only for materials 'relevant to a particular, narrow subject matter.'" Simmons, Inc. v. Bombardier, Inc., 221 F.R.D. 4, 8 (D.D.C. 2004) (emphasis added) (quoting Thorn EMI N. Am., Inc. v. Micron Tech., Inc., 837 F. Supp. 616, 621 (D. Del. 1993) (citing cases)); see also In re Sealed Case, 877 F.2d at 981 (noting that the scope of a waiver can be "limited" and warning of the "potential implications of [adopting] a broad definition of the subject matter"). And this general rule makes good sense. After all, the "purpose [of the attorney-client privilege] is to encourage full and frank

---

[9] Agility also points to the disclosure of other documents that are similarly non-privileged. See Pls.' Mot. at 36. For the same reason though, the Court finds that these disclosures do nothing to expand the scope of DLA's waiver. See Trustees of Elec. Workers, 266 F.R.D. at 10.

[10] Again, Agility has not identified any documents that might contain information of this sort, and the Court has not found any in its in camera review. Once again for the record, however, the Court notes that DLA is obliged to turn over such documents—if they exist.

communication between attorneys and their clients," Upjohn, 449 U.S. at 389—a purpose that would be undermined if the Court brought to light a broad spectrum of communications simply because the Agency revealed a few conversations on a few narrow subjects. With this purpose in mind, the Court sees no reason to require the broad disclosures Agility demands.

### III. WORK-PRODUCT DOCTRINE

Moving along, then: the work-product doctrine protects "documents and tangible things that are prepared in anticipation of litigation." Fed. R. Civ. P. 26(b)(3)(A). The protection offered by the doctrine "is broader than the attorney-client privilege in that it is not restricted solely to confidential communications between an attorney and client. It is narrower, however, insofar as the doctrine protects only work performed in anticipation of litigation or for trial." FTC v. Boehringer Ingelheim Pharms., Inc., 778 F.3d 142, 149 (D.C. Cir. 2015) (internal citation omitted).

Once again, a review of DLA's privilege log and declaration, as well as an in camera review of the documents in question, convinces the Court that the redactions here properly fall under the work-product-doctrine umbrella. As the declaration explains (and the privilege log and in camera review confirm), the documents withheld under the doctrine were prepared "in anticipation of: (1) this Touhy litigation; (2) the GAO bid protest proceedings; (3) the Pennsylvania defamation case; or (4) potential litigation in the context of FOIA requests." Decl. at 15–16. Moreover, the redacted material reflects the thoughts, opinions, and factual recitations of counsel related to these cases, and it therefore constitutes "work product" as this Circuit has defined it. See, e.g., Tax Analysts v. IRS, 117 F.3d 607, 620 (D.C. Cir. 1997) (work product includes "mental impressions, conclusions, opinions, or legal theories," as well as "factual materials prepared in anticipation of litigation" (internal quotation marks omitted)). Hence, the Court is convinced that DLA has met its disclosure obligations on this front.

Agility, unsurprisingly, is less convinced, and it lodges several arguments to lobby for additional disclosures. First, it points to three documents that DLA refused to disclose on the basis of the work-product doctrine: documents 1150, 1293, and 3978. Pls.' Mot. at 37–38. But its complaints regarding two of these documents have been overcome by events. As Agility concedes, DLA has already produced a completely unredacted copy of document 1150, see id. at 37, so this document is no longer in dispute. A similar story goes for document 1293, which—DLA admits—was initially "excessively redacted, but DLA has voluntarily withdrawn that version and produced a version with redactions consistent with the assertion of work-product privilege." Gov't's Opp'n at 45. The Court's in camera review supports that conclusion—the (now) redacted material contains what appears to be work product produced in anticipation of a possible challenge to the award of a government contract. And document 3978 likewise survives in camera scrutiny. It is what DLA says it is: "a four-page memorandum discussing the common interest privilege prepared in anticipation of the Pennsylvania defamation case." Id. at 44.

Agility quibbles with this last point. It argues that some of the agency's redacted documents (like document 3978) could not have been produced in anticipation of litigation in Pennsylvania, because DLA is not a party to that case. See Pls.' Reply at 26. But this misstates the rule. The work-product doctrine is not limited to those cases where litigation is a foregone conclusion. Instead, "[f]or a document to meet [the anticipation-of-litigation] standard, the lawyer must at least have had a subjective belief that litigation was a real possibility, and that belief must have been objectively reasonable." In re Sealed Case, 146 F.3d 881, 884 (D.C. Cir. 1998) (emphasis added). That standards is met here. Indeed, as Agility admits, DLA employees are already scheduled to participate in depositions as part of the Pennsylvania case, see, e.g., Pls.' Mot. at 7, and Agility anticipates that these same employees will be "fact witnesses . . . in the

16

Pennsylvania litigation," id. at 10. Given the agency's starring role in that case, then, it was "objectively reasonable" for DLA counsel to think that litigation was just around the corner.

Agility persists that DLA has waived the work-product doctrine's protection because it engaged in "inconsistent production[] of documents that purportedly contain work product," including, for example, improperly redacting material that had already been released. Pls.' Reply at 27. To be sure, "at some point acceptable tactics may degenerate into sharp practices inimical to a healthy adversary system," which can lead courts to deem the usual work-product protections waived. In re Sealed Case, 676 F.2d 793, 818 (D.C. Cir. 1982) (internal quotation marks omitted). But the Court finds no evidence of such "sharp practices" here. The "inconsistent production" that Agility complains of does not seem to be the result of bad faith or gamesmanship; instead, the mistakes seem to trace back to the tight timelines involved in the production of thousands of documents—which is an innocent-enough excuse. In any event, DLA has demonstrated its willingness to correct problematic redactions when it becomes aware of them. See Gov't's Mot. at 45. This behavior is a far cry from the showing necessary to find waiver. See In re Sealed Case, 676 F.2d at 821 (finding waiver where a party offered "express assurances" that it had turned over all documents, when it had not actually done so).

## IV.  TRADE SECRETS ACT

Finally, Agility challenges DLA's decision to withhold eight documents on the basis of the Trade Secrets Act, which makes it a criminal offense for government employees to disclose "in any manner or to any extent not authorized by law" a range of confidential, proprietary information in the government's possession. 18 U.S.C. § 1905. DLA has elected to withhold these documents because (it claims) they "contain confidential, proprietary information, which KGL would not ordinarily disclose to the public." Decl. at 17. And its declaration concludes: "[u]nder the Trade

Secrets Act, the government cannot release the challenged proprietary documents without express authorization by KGL or other appropriate legal authorization." Id.

There is just one problem with that position: "other appropriate legal authorization" is right under DLA's nose. This Circuit has explained that the Trade Secrets Act "seems to embody a congressional judgment that private commercial and financial information should not be revealed by agencies that gather it, absent a conscious choice in favour of disclosure by someone with power to impart the force of law to that decision." CNA Fin. Corp. v. Donovan, 830 F.2d 1132, 1141 (D.C. Cir. 1987) (emphasis added). This Court holds that power. That is to say, it can order DLA to disclose the documents containing trade secrets—which would, of course, put that disclosure outside the bounds of the Act's criminal prohibitions. See, e.g., United States v. W.R. Grace, 455 F. Supp. 2d 1140, 1148 (D. Mont. 2006) (explaining that the Act did not prohibit disclosure, because "[t]he production . . . is compelled by this Court's discovery orders"); cf. Canal Auth. v. Froehlke, 81 F.R.D. 609, 613 (M.D. Fla. 1979) ("It is clear that information which is otherwise discoverable under [the Federal Rules] is information which the Government is authorized by law to disclose."). Thus, the Trade Secrets Act is no obstacle to disclosure here—assuming that disclosure follows a court order requiring it.

Has Agility shown that this case warrants such an order? Yes, in this Court's estimation. DLA has made no effort to claim that KGL's confidential, trade-secret information is privileged and thus exempt from disclosure in response to third-party subpoenas[11]—likely because no such common-law privilege exists. See Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill, 443

---

[11] DLA cites several cases that analyze the withholding of trade-secret information, see Gov't's Opp'n at 50 (citing, for example, Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin., 244 F.3d 144 (D.C. Cir. 2001), and McDonnell Douglas Corp. v. Nat'l Aeronautics & Space Admin., 895 F. Supp. 316 (D.D.C. 1995)), but this case is quite different from those in one important respect. The cited cases arise under the Freedom of Information Act, which includes a provision that exempts confidential information from disclosure, see 5 U.S.C. § 552(b)(4); but that statute (including its confidential-information provision) has no application here.

U.S. 340, 362 (1979) ("[T]here is no absolute privilege for trade secrets and similar confidential information." (internal quotation marks omitted))). Therefore, without any privilege on which to hang its hat, DLA's continued withholding of these eight documents is an impermissible (that is to say, arbitrary or capricious) application of its own Touhy regulations. See 32 C.F.R. § 97.4. It cannot act in this way; thus, these eight documents must be disclosed.

One last thought on this matter: although the trade-secret information in DLA's possession is subject to disclosure, this result need not leave the documents completely unprotected. Instead, as contemplated by the Federal Rules of Civil Procedure, DLA is free to seek a protective order that "require[s] that [the] trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way." Fed. R. Civ. P. 26(c)(1)(G). Alternatively, it could agree to release the eight contested documents subject to the protective order that is already in place in the Pennsylvania case.[12] See Ex. DD to Pls.' Mot. [ECF No. 40-34] at 2. But that choice for DLA—including the exact contours of any protective order—is outside the scope of the present motion.

## CONCLUSION

Therefore, Agility's motion to compel (or in the alternative, for summary judgment) will be granted in part and denied in part. A separate Order will issue on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: June 23, 2015

---

[12] Without citation to any authority, DLA claims that "[a] protective order entered into by KGL and Agility in state court litigation to which DLA is not a party is not an appropriate method for DLA's disclosure of this proprietary information." Gov't's Opp'n at 50. But there is no obvious reason why this should be so. The Trade Secrets Act no longer ties DLA's hands. So the only party with any lingering concern over the disclosure of any "secrets" is KGL—a company that has already agreed to proceed under the terms of the Pennsylvania protective order. The basis for DLA's claim is thus something of a mystery, and the Court cannot credit it.